in the court below and hence cannot be assigned for error here.

.The third, fifth, sixth, seventh and ninth assignments of error are sustained, and the judgment is reversed with a venire facias de novo.

---

215   586
s 36 SC 141
s 36 SC 143

# Groff's Estate.

*Executors and administrators—Widow's exemption—Misconduct of executors —Interest and counsel fees.*

Where executors attempt to take $300 from the estate upon the claim that they had paid such sum to the widow as her exemption, when in fact the widow received her exemption in goods and chattels, the executors will not be allowed compensation for extra services performed by them in the administration of the estate.

An executor who delays for several years in paying a judgment held by the estate against himself will be surcharged with interest thereon.

Executors will be allowed counsel fees and costs of litigation in resisting litigation against the estate where they have reasonable grounds for believing such litigation unjust, and this is the case although they may be entitled to a remainder in the estate after the termination of a life interest.

Argued May 16, 1906.   Appeals, Nos. 151 and 159, Jan. T., 1906, by Abram E. Groff and Wayne I. Groff, Executors of Solomon C. Groff, deceased, and by W. U. Hensel, Transferee of Kirk Johnson & Co., from decree of O. C. Lancaster Co., April T., 1905, No. 22, upon exceptions to the executors' accounts.   Before MITCHELL, C. J., FELL, MESTREZAT, POTTER and ELKIN, JJ.   Affirmed.

Exceptions to executors' accounts.

SMITH, P. J., filed the following opinion :

Solomon C. Groff died testate December 19, 1898.   A widow and six children survived him.   His sons, Wayne I. and Abram E., were made the executors of his will, and to them he gave his entire estate after the death of his widow, excepting that to Abram was devised a house and lot in Bareville. His death was soon followed by lawsuits.   The executors

were made defendants in five actions. The first was that of a daughter, Susanna E. Sprecher. Judgment was entered for $100 by a justice of the peace in her favor. On a trial in the court of common pleas there was a verdict for the defendants. Reasons for a new trial were argued and the motion refused.

The next was the suit of L. S. Groff, a son. This was an action in assumpsit on a bond for $3,000. The writ was issued April 14, 1899. After motions, rules and continuances, the case was tried December 6, 1904, resulting in a verdict of $4,170 in favor of the plaintiff. A new trial was granted, and again the verdict was for plaintiff, in the sum of $4,327.46. A second rule for a new trial was discharged, January 3, 1906. No appeal has been taken.

Harriet L. Shaeffer, a daughter, brought suit April 19, 1899, and laid her damages in the sum of $5,000. A jury was called December 5, 1900, which rendered a verdict for the defendants, December 7, 1905.

Maria Groff, the wife of George Groff, a son, brought a suit, April 19, 1899, to recover on a note. On October 5, 1901, the jury disagreed and was discharged. February 12, 1903, the case was called for trial, and on February 14, 1903, there was a verdict for $4,800, in favor of the plaintiff. A new trial was refused, and an appeal was taken to the Supreme Court, which court affirmed the judgment of the lower court.

The fifth and last case was that of Kirk Johnson, trading as Kirk Johnson & Company, to recover on a replevin bond. On December 6, 1901, a jury found for the plaintiff in the sum of $1,036. A rule for a new trial was discharged. On appeal to the Superior Court, the judgment was reversed and a new trial ordered. At the second trial, January 30, 1905, the jury again rendered the same verdict.

Payment of the L. S. Groff and Maria Groff claims was resisted on the ground that their notes were forgeries. These cases evidently were characterized by the intensity and virulence which distinguish family contests.

The executors exhibited their first account August 13, 1900, which shows a balance of $1,759.55. To this the following exceptions were filed:

"1. The accountants have not charged themselves with all the money that came or should have come into their hands.

"2. The following items in said account are hereby excepted to:

"April 1, 1899. Paid A. E. Groff, board, etc., decedent's wife, $99.50.

"April 1, 1899. Paid Susanna Groff, widow's exemption, $300.

"Accountant asks credit for amount of certificate of judgment note against Wayne I. Groff, not yet collected, $3,500."

A second account, showing a balance of $5,775.62 which includes the balance in the first account, was filed January 15, 1906. To this exceptions also were filed, the first of which corresponds with the first account. The second is to the credits, seriatim. The third assigns a reason in support of part of the second exception,—to the credits of counsel fees. The fourth reaffirms the exception to the accountants' "extra compensation," and the fifth is to the payments alleged to have been made to the widow for which credits were not taken.

The only questions before us are those incidental to the exceptions to the two accounts.

The exception to the two credits in the first account raises the only question that needs be considered independent of those contingent upon the exceptions to the second account. The first is to the payment of $99.50 to "A. E. Groff, board, etc., decedent's wife." This exception was not resisted, nor was the credit in any way explained by the accountants. The exceptants manifestly were mistaken, as there is no such credit. We find what was referred to by them, but which they incorrectly deciphered or misunderstood, to be, "Paid A. E. Groff boarding, etc., decedent and wife $99.50." The accountants' receipt shows that the payment was "in full for boarding for Solomon C. Groff and wife." The debt apparently was the testator's, in which case, if his estate is solvent, the payment was not an improper one. If, on the other hand, the estate is insolvent, and such are the indications, only a pro rata dividend can be allowed on account of this claim. The accountants are surcharged $99.50, with the subrogated right to present the claim for payment.

As to the other part of the exception—"widow's exemption, $300," the accountants offered nothing in opposition to its affirmation. They were present and remained mute. The

widow's appraisement could not be found. An unsuccessful search was made for it. The record shows that there was an "appraisement of $300 worth of goods and chattels claimed and set apart for the use of Susanna Groff, widow of said deceased." That "goods and chattels" belonging to the estate to the value of $300 were appraised and set apart for the widow, seems probable from the fact that none were inventoried nor accounted for. This exception is sustained.

Among the testator's investments was a loan of $3,500 to his son, Wayne I. Groff. This was secured by a judgment note, entered in the court of common pleas of Lancaster county, and which was a lien on certain real estate. This judgment was revived by the accountant himself against himself on December 11, 1903. It does not appear that it was paid before December 27, 1905, at which time a deposit of $5,089 was made to the credit of "Wayne I. Groff one of the Ex." For about five years, until August 29, 1905, Wayne I. Groff, the active executor, deposited the money of the estate to his individual account and used it indiscriminately with his own. Authorities are unnecessary, though abundant, to support the obviously just demand that the accountants be surcharged with interest on this loan. The judgment was an interest-bearing investment made by the testator. Its payment alone could interrupt the running of interest, and even then if the money had been mixed with the accountants' funds and used as their own, interest would be chargeable; nor would they have escaped the payment of interest had they deposited the principal to an executor's account and permitted it to remain idle all these years. The first exceptions to both accounts are sustained, and the accountants are surcharged with legal interest on $3,500 from April 1, 1898, the time to which it had been paid, until December 27, 1905, amounting to $1,625.15.

. The second exception to the second account embraces many credits, chiefly the costs and expenses of litigation, most prominent among which are counsel fees. The fees are $400 paid December 7, 1900; $400, October 16, 1901; $400, April 8, 1903; and $300, January 12, 1906, aggregating $1,500. There is another for $100 credited against the proceeds of real estate. That executors may employ counsel will not be disputed, nor will their authority to sue and defend against suits be ques-

tioned, and when they act in good faith under the advice of
counsel they are generally relieved from personal liability. If
an administrator acts in good faith, as a cautious, prudent man
would do under similar circumstances, although the conse-
quences may be bad, he will not be surcharged: Allam's
Estate, 199 Pa. 573.

"An administrator who, in good faith, litigates a claim
against the estate of his intestate is entitled to credit in his
adminstration account for the costs and expenses of the litiga-
tion, including the amount paid for counsel fees; and also to
an allowance for his time and trouble:" Ammon's Appeal, 31
Pa. 311.

These accountants were placed in a trying position. Scarcely
had they assumed the responsibilities of the trust when they
were beset with suits. Each of the four disappointed and dis-
inherited children of the testator opened up on them with the
batteries of the courts. Their position was precarious. Either
horn of the dilemma was charged with danger. A passive
yielding to the demands of the claimants guaranteed no more
protection against surcharges than an active resistance of
them. If they had information sufficient to support a reason-
able belief that the demands were unjust, such information as
would have influenced a careful, prudent man to resist them,
they ought not to be punished for attempting their defeat, if it
was done in a proper way and at a fair cost. Unquestionably,
the way for them to proceed was to employ counsel and be
guided by them. This they did. No blame can be attached to
them for the manner in which the cases were tried. For this
their counsel were responsible. While the costs and charges
seem extravagant, we, nevertheless, are at a loss to see how
the accountants could have escaped the majority of them.
They were in the hands of their lawyer, whose fees, together
with those of expert witnesses, whom they wanted and person-
ally subpœnaed, alone added over $2,200 to the expenses, in
addition to fees amounting to $250 in the first account. The
accountants are less censurable by reason of having made these
payments by installments than they would have been had they
paid a bill for the aggregate amount at the conclusion of the
services. Even if the amount had been the same, the condition
would have been diffierent. If, after their labors had ceased,

counsel had made an unwarrantable charge, accountants would have been justified in indulging in a sixth lawsuit rather than pay it, or they could have asked the court to pass on it at the audit. They then would have acted with their eyes open and with a remedy at hand. As it was, they were hampered. It will be seen that their first fee paid counsel in the second account was on December 7, 1900, the next on October 16, 1901, the third on April 8, 1903, and the last one on January 12, 1906. During this time litigation was active. Rules and trials and appeals and arguments were happening. Demands for fees, no doubt, were made and fees were paid. True, at any stage, accountants could have refused payment, and counsel could have refused to serve. Even if accountants had been willing to assume the responsibility of a suit for a balance which might be claimed by counsel, they would, in addition, have been in danger of being held accountable for an adverse determination of these suits. To discharge counsel, who are supposed to have their cases well in hand, when they are about to engage in trials, or after trials, pending motions, rules and appeals, might be regarded as a more disastrous spoiling of an estate than to pay the fees demanded. These accountants appear to have been in a trap, and one which, under the circumstances, they could not have avoided.

It is contended that none of the credits to which exceptions have been filed can be sustained for the reason that they were for bills incurred by accountants in their own behalf for the protection of an estate of which they were the residuary legatees. This contention is not without merit. It would have more force if the bequests to these two sons were not subject to the life estate in the widow. As executors they could not afford to neglect the trust even if they appeared to be guarding their own interests. Their personal interest, nevertheless, subjects their administration acts to more than the ordinary scrutiny. Their motives are more likely to be questioned and their judgment criticised than those of one free from personal interest. Nevertheless, if their conduct has not been injuriously selfish and has been free from fraud, they ought not to be made to suffer. From what we now know it probably would have been to the advantage of all had they offered no resistance to three of the claims, but if they had so done, they might not have es-

caped a surcharge. The cestui que trust, who now makes no complaint, might then have taken exception to the payment of notes tainted with the suspicion of fraud.

With the exception of a few dollars for typewriting a subpæna, depositions and the register's fees, the last fee to counsel and accountants' commissions, the credits excepted to were payments made before any final judgment was entered against accountants. They made these payments when they had a fighting chance to win all the cases. This strengthens the idea that they paid only what they believed proper, or that from which they could not escape. If they had been successful, ultimately every dollar of these costs would have come out of their pockets. These credits we will not disturb.

The court records and other evidence were offered to show the character and extent of the work done by accountants' counsel. One of them as a witness was asked the value of specific services. He estimated those rendered in the Sprecher case, which involved about $100, to be worth $50.00. As to the other cases, he protested his inability to apportion them. We recognize a lawyer's difficulty in attempting to fix a charge for specific professional work when it is a part of a series of services. It is less embarrassing when the services are distinguished by independent suits. A lawyer's work cannot be measured as is a piece of calico or a cask of molasses. Usually, he makes a lump charge. If the lump is not too large, nothing more is necessary. When its payment is resisted, it is incumbent upon him to make an attempt at an analysis and a particular valuation; do that, at least, which will throw the most light upon his work and its value. Disagreeable though this may be, at times it is unavoidable. The only evidence of this character which we have fixes the value of counsels' services in the Sheaffer case at $200 to $250, in the Kirk Johnson case at $200 to $250, in the Maria Groff case at $300 to $400, and in the L. S. Groff case at $250 to $300.

The payment of $300 to counsel on January 12, 1906, is not in the same class as the three previous payments. This was like unto the presenting of a bill at the termination of services. Accountants could and should have refused its payment. The signals indicated a storm. They had ample warning and every reason to expect the present contest. Even if they thought

the bill a fair one, out of an ordinary precaution they ought to have postponed its payment until it had been allowed by the court at the audit. As to this payment, too, accountants are less free from the suspicion of being indifferent to the interests of the estate. This part of the exception is sustained.

We have found, substantially, that this estate was burdened with litigation, that it was not the accountants' fault, that they acted within the scope of their authority in defending against suits, and, therefore, they were put to "extraordinary labor," and, therefore, ought to receive extraordinary pay, unless they have in some other way forfeited the consideration to which faithful trustees are entitled. We would allow liberal compensation for accountants' extra work excepting for the credit of $300—widow's exemption. This suggests bad faith and shatters confidence in accountants' integrity of purpose. The widow's exemption has been mislaid, concealed or lost. The record shows that goods and chattels of the value of $300 were appraised and set apart for their use; with a full knowledge of this and without having inventoried or charged themselves with anything except a judgment note, a mortgage and some money in bank, they deliberately take credit for $300 as having been paid to the widow on account of her exemption. It looks like a premeditated attempt to appropriate that amount of money. There does not seem to be a palliating circumstance. If goods and chattels were not set apart for the widow, if she elected to retain $300 out of "bank notes, money, stocks, judgments or other indebtedness," or out of real estate, why didn't they say so? They did not forget it, for it was rung into their ears with a persistency equaled only by the earnestness with which the exception was pressed, yet of this they did not speak nor did anyone speak for them. If any explanation was possible, the withholding of it is unpardonable. That part of the exception covering accountants' compensation, $175, and the accountants' claim for extraordinary labor, $500, is sustained, which with the previous surcharges will amount to $2,999.65, and make the balance in the account $8,775.27.

The third exception—"All counsel fees charged by accountants are objected to because the creditors of the estate warned the accountants to incur no such expense"—is an argument rather than an exception. If claimants against an estate could

quiet opposition by serving notice upon its representatives not to incur expenses in resisting their demands, an estate could easily be stripped by any who adopted this method of intimidation. In Ammon's Appeal, 31 Pa. 311, such notice was given. Woodward, J., said, "We think the auditor was quite right in disregarding the notice Ammon and wife gave to the administrator, not to appeal from the award of the arbitrator, and in holding that the administrator was entitled to defend the suit at the costs of the estate."

The fourth exception—"All extra compensation for accountants is objected to"—was considered under the third and has been disposed of.

The fifth exception relates to a memorandum following the account and which has nothing to do with it. It certifies that certain sums have been paid to the testator's widow, but no credit has been taken for them.

The cardinal principles by which the conduct of executors and administrators is gauged are common honesty and common sense. From these radiate a multitude of elements which may be qualified by the peculiar facts and circumstances of each case.

*Errors assigned* were rulings on various exceptions.

*J. W. Denlinger* and *B. F. Davis*, for the executors.

*W. U. Hensel*, with him *M. G. Schaeffer*, for *Harriett Schaeffer, Kirk Johnson & Co.* et al.

Per Curiam, May 24, 1906 :
The decree is affirmed on the opinion of the court below.